UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MARTIN BERDINKA, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 4:22 CV 1004 ACL |
| MARTIN O'MALLEY,[1] Commissioner of Social Security Administration, | ) |
| Defendant. | ) |

**MEMORANDUM**

Plaintiff Martin Berdinka brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.

An Administrative Law Judge ("ALJ") found that, despite Berdinka's severe impairments, he was not disabled as he was capable of performing work existing in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).  A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be reversed and

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley shall be substituted for Kilolo Kijakazi as the defendant in this suit.  See 42 U.S.C. § 405(g).

remanded.

## I. Procedural History

Berdinka filed his application for DIB on June 13, 2017.  (Tr. 304-11.)  He claimed he became unable to work on December 9, 2015, due to hereditary hemochromatosis,[2] alpha-1 antitrypsin deficiency, severe constant muscle spasms and cramps, and constant fatigue.  (Tr. 786.)  He subsequently amended his alleged onset date of disability to January 1, 2017.  (Tr. 367.)  Berdinka was 45 years of age at his alleged onset of disability date.  (Tr. 379.)  His application was denied initially.  (Tr. 506-10.)

Berdinka's claim was denied by an ALJ on April 2, 2019.  (Tr. 496-500.)  The Appeals Council remanded the matter to the ALJ to determine whether Berdinka had good cause for not appearing at a previous hearing.  (Tr. 501-04.)  Upon remand, the ALJ found Berdinka had good reason for failing to appear at the previous hearing and granted another opportunity for a hearing, which took place on March 10, 2021.  (Tr. 367.)  A supplemental hearing took place on June 8, 2021.  *Id.*

On August 19, 2021, the ALJ again denied Plaintiff's application for benefits.  (Tr. 367-80.)  The Appeals Council denied Berdinka's claim for review.  (Tr. 1-4.)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Berdinka first argues that the ALJ's decision "lacks proper evaluation of opinion evidence."  (Doc. 29 at 3.)  Berdinka next contends that the decision "lacks any

---

[2]Hemochromatosis is a disorder where too much iron builds up in the body.  The body stores the excess iron in the joints and organs such as liver, heart, skin, pituitary gland, and pancreas.  This damages the organs and can cause organ failure.  *See Web*MD, https://www.webmd.com/a-to-z-guides/what-is-hemochromatosis (last visited January 26, 2024).

evaluation of Plaintiff's pain complaints." *Id.* at 7. He also argues that the "RFC is not supported by substantial evidence." *Id.* at 11. Finally, Berdinka argues that the ALJ's decision "failed to properly evaluate all non-severe impairments." *Id.* at 20.

## II.  The ALJ's Determination

The ALJ first found that Berdinka met the insured status requirements of the Social Security Act through December 31, 2021. (Tr. 369.) She stated that Berdinka has not engaged in substantial gainful activity since his amended alleged onset date of January 1, 2017. *Id.* In addition, the ALJ concluded that Berdinka had the following severe impairments: left shoulder degenerative joint disease, cervical spine degenerative disc disease, right elbow bursitis, left hip labral tear, obesity, asthma, mild liver disease, and hereditary hemochromatosis. (Tr. 370.) The ALJ found that Berdinka did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. *Id.*

As to Berdinka's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can only occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance (as defined by DOT and SCO) and occasionally stoop, kneel, crouch, and crawl.  He should avoid exposure to vibration and extreme cold; he can occasionally reach overhead with his bilateral upper extremities; frequently handle and finger with his bilateral upper extremities; and should avoid exposure to concentrated fumes, gases, dust, odors and poor ventilation.

(Tr. 372.)

The ALJ found that Berdinka was not capable of performing his past work as an auto mechanic, but could perform other jobs that exist in significant numbers in the national economy,

such as cashier, collaborator/operator, and marker. (Tr. 379.) The ALJ therefore concluded that Berdinka was not under a disability, as defined in the Social Security Act, from January 1, 2017, through the date of the decision. (Tr. 380.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on June 12, 2017, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

*Id.*

### III.  Applicable Law

### III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

      2.      The plaintiff's vocational factors.

      3.      The medical evidence from treating and consulting physicians.

      4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

      5.      Any corroboration by third parties of the plaintiff's impairments.

      6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); s*ee also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003). Put another way, a court should "disturb the ALJ's decision only if it falls outside the available zone of choice." *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015) (citation omitted).

**III.B.  Determination of Disability**

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any kind of substantial gainful work which exists … in significant numbers in the region where such individual lives or in several regions of the country." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering

simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work."  *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment.  If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience.  20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work.  20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4).  "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations."  *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).  The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."  20 C.F.R. §

416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id*. If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

## IV. Discussion

Berdinka argues that the ALJ erred in determining his RFC. Specifically, he contends that the ALJ failed to properly evaluate the medical opinion evidence of record, and failed to properly consider Berdinka's non-severe impairments. He also argues that the ALJ failed to evaluate Berdinka's subjective reports of pain.

**Evaluation of Opinion Evidence and RFC**

The record includes medical opinions from treating orthopedist James Lu, M.D., and non-examining medical expert Steven Goldstein, M.D.   Berdinka contends that the ALJ failed to properly discuss the supportability or consistency of these opinions, which resulted in an RFC that was not supported by substantial evidence.

A claimant's RFC is the most he can do despite his physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).   It is the ALJ's responsibility to determine a claimant's RFC by evaluating all medical and non-medical evidence of record.   20 C.F.R. §§ 404.1545, 404.1546, 416.945, 416.946.   Some medical evidence must support the ALJ's RFC finding, but there is no requirement that the evidence take the form of a specific medical opinion from a claimant's physician.   *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012); *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011).   "The determination of a claimant's RFC during an administrative hearing is the ALJ's sole responsibility and is distinct from a medical source's opinion."   *Wallenbrock v. Saul*, No. 4:20-CV-00182-SRC, 2021 WL 1143908, at *6 (E.D. Mo. Mar. 25, 2021) (citing *Kamann v. Colvin*, 721 F.3d 945, 950-51 (8th Cir. 2013)).

Claims filed after March 27, 2017, like Berdinka's, require the ALJ to evaluate medical opinions pursuant to 20 C.F.R. § 404.1520c.   This provision states the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [Plaintiff's] medical sources."   20 C.F.R. § 404.1520c(a).   Rather, an ALJ is to evaluate the persuasiveness of any opinion or prior administrative medical finding by considering the: (1) supportability of the opinion with relevant objective medical evidence and supporting

explanations; (2) consistency with the evidence from other medical sources and nonmedical sources in the claim; (3) relationship with the plaintiff, including length, purpose, and extent of treatment relationship, whether it is an examining source, and frequency of examination; (4) specialization; and (5) other relevant factors.   20 C.F.R. § 404.1520c(c).

The rules make clear that supportability and consistency are the "most important factors;" therefore, an ALJ must explain how they considered these factors in the decision.   20 C.F.R. § 404.1520c(b)(2).   An ALJ may, but is not required to, explain how they considered the remaining factors.   *Id.*   *See Brian O v. Comm'r of Soc. Sec.*, 2020 WL 3077009, at *4 (N.D.N.Y. June 10, 2020) (quoting 20 C.F.R. § 404.1520c(a), (b)) ("Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how he or she considered the medical opinions' and 'how persuasive he or she finds all of the medical opinions.'"   (alterations omitted)).

On October 26, 2020, Dr. Lu performed a C5-6 anterior cervical discectomy, decompression, and instrumental interbody fusion.   (Tr. 1925.)   Berdinka's preoperative diagnosis was C5-6 central and left-sided herniated nucleus pulposus with cervicalgia and radiculopathy.   *Id.*   Berdinka had complained of chronic intermittent neck, cranial, and facial pain with numbness and tingling in both upper extremities.   (Tr. 1918.)   He had gone to the emergency room due to these symptoms, tried physical therapy, and underwent chiropractic manipulation, but these measures had become less effective over time.   *Id.*   The most recent imaging revealed degenerative changes with left-sided disc bulging producing left lateral recess and proximal foraminal stenosis at the C5-6 level.   (Tr. 1924.)   Dr. Lu indicated that these

findings could be a source of his neck and left upper extremity symptoms, but would not correlate well with the right upper extremity symptoms or craniofacial pain.  *Id.*

On November 11, 2020, Berdinka reported "life changing" improvement in his neck and shoulder pain.  (Tr. 1939.)  On December 11, 2020, Berdinka reported that he felt "terrible," and had experienced muscle spasms with sharp pain in the left side of the neck extending into the left trapezius region.  (Tr. 1946.)  Berdinka's physical examination was normal, other than mild to moderate tenderness along the mid axial and left cervical paraspinous region extending to the left trapezius region.  *Id.*  Dr. Lu indicated that Berdinka's pain recurrence may represent ongoing inflammation at the surgical site, and prescribed a corticosteroid.  *Id.*  He prescribed a muscle relaxant for the muscle spasms.  *Id.*  Dr. Lu cleared Berdinka to lift up to thirty pounds and to resume exercise at home or at the gym as tolerated.  *Id.*  He noted that, if Berdinka's pain did not improve, he would consider an MRI of the cervical spine and physical therapy or referral to pain management.  *Id.*  On January 13, 2021, Berdinka reported feeling better but continued to have intermittent spasms in the trapezius regions.  (Tr. 1999.)  On examination, his incision was well-healed, his motor and sensory examinations were normal, and his gait was normal.  *Id.*  Dr. Lu prescribed muscle relaxants for management of residual muscular pain.  (Tr. 2000.)  He released Berdinka to lift up to forty pounds.  *Id.*

The ALJ found that Dr. Lu's opinion regarding Berdinka's lifting limitations was "somewhat persuasive," because it was supported by his own examinations and history of treating the claimant," although it was "focused on the claimant's neck and shoulder region for the most part."  (Tr. 377.)  The ALJ continued that the "record as a whole discussed above as well as prior administrative medical findings and medical expert testimony show that the claimant is limited to less than light exertional work…"  *Id.*

Berdinka first argues that the ALJ failed to properly explain how she considered supportability and consistency with regard to Dr. Lu's opinion, and failed to explain the meaning of "somewhat persuasive." The ALJ stated that Dr. Lu's opinion was limited in scope, as it only addressed Berdinka's exertional limitations following his neck surgery. The ALJ ultimately found that Berdinka had greater exertional limitations than found by Dr. Lu—as well as non-exertional limitations—due to his combination of impairments that were not considered by Dr. Lu. As such, any errors in the ALJ's explanation of supportability and consistency with regard to Dr. Lu's opinion did not affect the outcome and were harmless.

The ALJ next discussed the opinions provided at the administrative hearing of internal medicine and neurology expert Dr. Goldstein. (Tr. 377.) She noted that Dr. Goldstein testified that Berdinka had the RFC to perform light exertional work due to neck and joint pain and obesity, except that he can never climb ladders, ropes, or scaffolds; only occasionally climb ramps and stairs; and occasionally stoop, kneel, and crawl. (Tr. 377, 427-28.) The ALJ found Dr. Goldstein's opinion was, "very persuasive," for the following reasons:

> it was supported by citations to the record and explanations of why he considered more than just neck problems and surgery with review of x-rays and treatment records in his thorough response to the claimant's representative's cross-examination, and his opinion is consistent with the record as a whole, as more fully discussed above.

(Tr. 377-78.)

The ALJ then made the following determination regarding Berdinka's RFC:

Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment which takes into consideration the claimant's limitations stemming from his severe impairments of left shoulder degenerative joint disease, cervical spine degenerative disc disease, and right elbow bursitis by limiting the claimant to never climbing ladders, ropes, or scaffolds; only occasionally crawling; avoiding all exposure to vibration and extreme cold; only occasionally reaching overhead with his bilateral upper extremities; and frequently handle and finger with his bilateral upper extremities. The

> undersigned accounts for the claimant's left hip labral tear, mild liver disease, hereditary hemochromatosis, and obesity by limiting the claimant to only occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; only occasionally balancing (as defined by DOT and SCO); occasionally stooping, kneeling, crouching, and crawling; and avoiding all exposure to vibration and extreme cold.   The undersigned takes into consideration the claimant's asthma by limiting the claimant to avoiding exposure to concentrated fumes, gases, dust, odors and poor ventilation.

(Tr. 378.)

Berdinka argues that the ALJ's explanation of how consistency and supportability were considered in concluding Dr. Goldstein's opinion was "very persuasive" are lacking and not supported by the record.   Regarding supportability, Berdinka claims that Dr. Goldstein's opinions are not supported by citations to the record or his responses to questions on cross-examination.   With regard to consistency, Berdinka argues that the decision fails to properly articulate how the doctor's opinion is consistent with the record as a whole nor does it identify a single piece of evidence that is consistent with Dr. Goldstein's opinion.

At the March 10, 2021, hearing, Dr. Goldstein stated that Berdinka's pain continued after his cervical fusion "because the source of his pain wasn't related to the degenerative disc disease, but I think more related to the musculoskeletal pains associated with the hemochromatosis." (Tr. 427.)   As a result, Dr. Goldstein stated that he "would place him at a light level of physical activity, both before and after the anterior cervical fusion was performed.   And, of course, his obesity also contributes to the fact that he would be at a light level."   *Id.*   When the ALJ asked if Dr. Goldstein had "any cites to the record, any that are different than what you've already given me," Dr. Goldstein responded "No, Your Honor."   *Id.*   Dr. Goldstein had previously cited to the following evidence in discussing Berdinka's severe impairments and whether they met the listings: (1) records from Berdinka's October 2020 cervical fusion (Tr. 1910-37); (2) Dr. Lu's normal neurologic examinations on May 8, 2020 (Tr. 1798) and January 2021 (Tr. 1999); and (3)

Page 13 of 18

liver biopsy results dated February 20, 2020 revealing mild liver disease (Tr. 2014). As to non-exertional limitations, Dr. Goldstein testified that Berdinka would be precluded from climbing ladders, ropes, and scaffolds due to his neck surgery and obesity, but could occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 428.) Dr. Goldstein testified that there were no limitations in the use of the hands or arms that he noted. *Id.* As to the records upon which he relied, Dr. Goldstein explained that there were "no cites, really. He has a normal exam." (Tr. 429.) He stated that he took into account the "normal neurologic examination," the "discomfort associated with hemochromatosis and the obesity." *Id.*

On cross-examination, Berdinka's attorney asked Dr. Goldstein whether the November 2019 MRI of Berdinka's left hip revealed any limitations. (Tr. 430-31.) Dr. Goldstein testified that the MRI showed "high-grade chondromalacia in the superior-lateral left acetabulum of the joint, and so I would say I should consider that as a severe impairment." (Tr. 431.) He stated that, although he did not consider it a severe impairment and "overlooked it," Berdinka should still be able to perform light work based on his examination that shows "basically a normal gait." *Id.* Berdinka's attorney next questioned Dr. Goldstein regarding the October 2018 MRI of Berdinka's left shoulder revealing a labral tear. *Id.* Dr. Goldstein testified that he "did not consider that." (Tr. 432.) He stated that this may "limit his overhead reaching with that shoulder to occasional," but he did not see a physical exam in the record. *Id.* Dr. Goldstein testified that Berdinka's joint pain and fatigue could be attributed to his diagnosis of hemochromatosis, but these symptoms would not affect his ability to function a full day in a work environment. (Tr. 433.) He explained that "it would be something that would be there all the time." (Tr. 433-34.) Berdinka's attorney pointed out that endocrinology notes dated July 22, 2020, indicate that Berdinka takes two to three naps a day. (Tr. 434.) Dr. Goldstein

testified that this would not be consistent with Berdinka's known diagnoses and that sleep apnea should be considered. *Id.* He stated that he took into consideration Berdinka's hand limitations when limiting him to light exertional level work. (Tr. 435.) Berdinka's attorney next questioned Dr. Goldstein regarding Berdinka's diagnosis of vertigo and his visits to the emergency room for vertigo and pain. (Tr. 436.) Dr. Goldstein testified that he saw in the record that Berdinka had been diagnosed with vertigo, but he did not see an evaluation of the cause of the vertigo. *Id.* When asked if pain affects Berdinka's ability to concentrate or focus, Dr. Goldstein testified, "[t]hat depends, again, on the severity of the pain. It certainly can affect one's ability to concentrate and focus if it's severe enough." (Tr. 437.)

The ALJ's discussion of the supportability of Dr. Goldstein's opinion consisted of noting the opinion was supported by citations to the record, review of x-rays and treatment records, and "thorough" responses on cross-examination. (Tr. 377-78.) The few citations Dr. Goldstein provided, however, do not support his opinions. They only reveal the lifting limitations imposed by Dr. Lu following neck surgery, Dr. Lu's normal examinations five months prior to surgery and three months after surgery, and Berdinka's diagnosis of mild liver disease. Dr. Goldstein's responses on cross-examination show that he either was not aware of some of Berdinka's impairments or did not consider them in providing his opinion regarding Berdinka's RFC. Although Dr. Goldstein testified that some of these impairments would be consistent with the performance of light work, his testimony also highlights the lack of some relevant evidence. For example, Dr. Goldstein noted that there was no record of an examination of Berdinka's shoulder range of motion to determine his limitations in overhead reaching, Berdinka should be evaluated for sleep apnea based on his complaints of extreme fatigue, and no evaluation had been performed to determine the cause of Berdinka's vertigo. Contrary to the ALJ's finding, Dr.

Goldstein's opinions are not supported by citations to the record or his responses to questions on cross-examination.

In addition, the ALJ's general statement that Dr. Goldstein's opinions are "consistent with the record as a whole" is insufficient to satisfy the Regulation's directive of explanation regarding consistency. An "ALJ's sprinkling of the words 'support' and 'consistent' in her cursory treatment of [medical] opinions is insufficient to satisfy the Regulation's requirement that the ALJ 'explain' how she considered these factors in determining the persuasiveness of a medical opinion." *Martini v. Kijakazi*, No. 4:20 CV 1711 CDP, 2022 WL 705528, at *4 (E.D. Mo. Mar. 9, 2022); *see also Post v. Kijakazi*, 2021 WL 4355349, at *7 (E.D. Mo. Sept. 24, 2021) (finding ALJ's statement that opinion was "consistent with the claimant medical record, as more fully discussed above" insufficient).

The Court finds that the ALJ erred in analyzing the persuasiveness of Dr. Goldstein's opinions. *See Martini*, 2022 WL 705528 at *4-5 (finding ALJ erred, requiring reversal, where the only discussion in the ALJ's decision of the supportability and consistency of the state agency consultants' medical opinions was "the findings about the claimant's physical and psychological impairments are consistent with the record as a whole and support the residual functional capacity set forth above").

The Court cannot conclude that the ALJ's error was harmless. "An error is harmless when the claimant fails to 'provide some indication that the ALJ would have decided differently if the error had not occurred.'" *Lucus v. Saul*, 960 F.3d 1066, 1069 (8th Cir. 2020) (quoting *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012)). Dr. Goldstein's opinion was especially significant because the ALJ limited Berdinka to a range of light work, consistent with Dr. Goldstein's opinion, although with additional environmental limitations. The vocational expert

testified to these specific limitations in order to determine what jobs Berdinka could perform in the national economy.  Thus, if the ALJ had found Dr. Goldstein's opinion less persuasive, the ultimate disability determination might have been different.

Moreover, there is no other opinion in the record evaluating the effect of Berdinka's combined impairments on his ability to work.  Berdinka has an extensive treatment history, consisting of more than a thousand pages of medical records from the relevant period of January 1, 2017, through August 19, 2021.  Berdinka testified that he experiences vertigo, mouth and lower extremity numbness, severe hip pain, severe swelling of the hands and feet, constant joint pain, tenderness with range of motion, difficulty writing with his hand, difficulty getting into and out of the car, difficulty dressing, difficulty walking long periods, cannot stand longer than five minutes, cannot sit more than fifteen minutes, cannot lift more than four pounds, and must take two to three naps a day due to excessive fatigue.  (Tr. 373, 460-72.)  Berdinka has sought treatment regularly from physicians, orthopedic surgeons, hepatologists, endocrinologists, urgent care clinics, emergency rooms, chiropractors, and physical therapists for his various impairments and has undergone imaging.  (Tr. 1164-2130.)  He has undergone surgery for his neck (Tr. 1925), left shoulder (Tr. 1160), right elbow (Tr. 1137), and right hand (Tr. 1110).  As previously discussed, Dr. Lu only evaluated Berdinka's lifting limitations following his October 2020 cervical surgery.

Although "there is no requirement that an RFC finding be supported by a specific medical opinion," an RFC "is a medical question [and, therefore,] an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).  As noted above, the ALJ relied upon the opinion of Dr. Goldstein despite failing to provide an adequate explanation for the consistency

and supportability of Dr. Goldstein's opinion. Dr. Goldstein testified that Berdinka's joint pain and fatigue could be attributed to his hemochromatosis, that these symptoms "would be something that would be there all the time," and that they could affect his ability to concentrate. (Tr. 433-34.) He further testified that the record was lacking an examination demonstrating Berdinka's shoulder range of motion.

The Court finds that the ALJ erred in analyzing the persuasiveness of the medical opinion evidence. This error affected the ALJ's RFC determination, which renders it without the support of substantial evidence. On remand, the ALJ must fully evaluate and explain the supportability and consistency of the medical opinion evidence, in accordance with 20 C.F.R. § 404.1520c. The ALJ should also obtain additional evidence, in the form of source statements from treating physicians or consultative examinations, addressing Berdinka's ability to function in the workplace with his combination of impairments. In light of the remand and reevaluation of Plaintiff's RFC, the ALJ shall likewise reevaluate the consistency of Berdinka's subjective complaints in accordance with *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

## Conclusion

For the reasons discussed above, the Commissioner's decision is not based upon substantial evidence on the record as a whole and the cause is therefore remanded to the Commissioner for further consideration in accordance with this Memorandum and Order.

/s/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 9th day of February, 2024.